**William CAMERON, Plaintiff,**

v.

**NAVISTAR INTERNATIONAL TRANSPORTATION CORP.,**
**Defendant.**

**No. 97 C 5086.**

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 21, 1998.

---

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff William Cameron ("Cameron") has filed a Complaint against Defendant Navistar International Transportation Corp. ("Navistar"), alleging that: (1) Navistar discriminated against him in violation of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.* (Count I); (2) under Indiana law, Navistar terminated him in retaliation for filing a worker's compensation claim (Count II); and (3) his termination from Navistar amounted to intentional infliction of emotional distress (Count III). Navistar now moves for summary judgment. For the reasons set forth below, the Court grants Navistar's motion.

### FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed.[1] Cameron began his job with Navistar as an assembler around November 15, 1995.[2] Assemblers working

1. The Court has assembled these facts from the parties' Local Rule 12(M) and 12(N) factual statements. Cameron has not presented any "additional facts that require denial of summary judgment" in accordance with Rule 12(N)(3)(a) but has instead peppered his response to Navistar's Rule 12(M) statement with additional factual allegations. This type of response does not properly conform to Rule 12(N), and the Seventh Circuit has "consistently and repeatedly required strict compliance with rule 12(N)." *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1316 (7th Cir. 1995). Moreover, in "denying" some of the facts presented by Navistar in his 12(N) response, Cameron failed to provide specific references to affidavits, portions of the record or other supporting materials as required by Rule 12(N)(3)(a). That type of response is insufficient. *See Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994). Accordingly, this Court will deem Navistar's properly supported 12(M) factual statements admitted for purposes of this motion in those instances where there are no specific references set forth by Cameron which would establish a factual dispute.

2. Cameron was initially hired by Navistar's predecessor, International Harvester Company, in 1969. Cameron was laid off in 1981. In 1994, Cameron applied for a position with Navistar and was rejected. As a result of his rejection, Cameron filed a charge of discrimination against Navistar alleging race discrimination. That charge was settled, and, as part

on the assembling lines are required to use various air and electric tools in the performance of their duties. Many, if not all, of the tools are suspended above the various work stations along the lines. The use of these tools, or at least the ability to work where these tools are present, is an essential function of the assembler's position. Cameron's position required the use of an air gun which was suspended above his work station.

On November 22, 1995, Cameron claims that a suspended tool struck him in the head. As a result, Cameron allegedly sustained an injury and remained out of work until December 15, 1995. Cameron was released to return to work with the restriction of no work "involving suspended air/electric tools" because of his fear of being around suspended tools.

Upon Cameron's return to work, Steve Metz ("Metz"), the Safety and Medical Team Leader for the Indianapolis plant, attempted to locate a position within Cameron's work restriction. Metz found, however, that Cameron's work restriction prevented him from performing the essential duties of any assembler position on either the main or pedestal line, as all of them involved the use of, or had within the work area, suspended air or electric tools.

Metz allowed Cameron to perform "light duty" on a temporary basis. "Light duty" assignments at the Indianapolis plant are generally given to employees who have temporary work restrictions. There are no permanent "light duty" positions at Navistar's Indianapolis plant. Cameron's "light duty" assignment lasted approximately one week and then the plant shut down for the holidays.

Upon Cameron's return to work after the holidays, Metz located a vacant position for Cameron which he believed met Cameron's work restriction of not working with or around suspended air or electric tools. According to Navistar, this job involved moving engine blocks from the main line to the pedestal line with the help of a crane. Cameron, however, says that he was never informed that the "new position" involved using a crane to stack engine blocks; instead, he says that he was told to follow a co-worker who took him to an area around suspended tools.

On January 11, 1996, as Cameron was starting to work at this new position, or at least being explained the position, he began to feel dizzy and passed out. Cameron was sent to Indiana Community Hospital after the incident, and he has not since worked at Navistar.

On January 12, 1996, Cameron attempted to see Navistar's physician at the Indianapolis plant dispensary. The individual at the nurse's station told Cameron that he needed a work release to be seen by the company doctor, and Cameron left. Cameron did not return to work that day, and he remained absent from work for the next ten days without contacting Navistar regarding his whereabouts or the reason for his absence.

On January 22, 1996, Cameron again appeared at the plant dispensary to inquire about seeing the company doctor. At this time, Cameron was "repeatedly" told that he needed to supply Navistar with medical documentation concerning his condition, the nature and extent of his treatment, and his return-to-work status. Cameron did not submit any such documentation.

Over the course of the next week, Cameron remained absent from work, again without contacting Navistar or presenting any documentation concerning his continued absences. He also did not return telephone calls made by Navistar dispensary personnel attempting to ascertain his

of the settlement, Navistar hired Cameron to work as an assembler at its Indianapolis,

Indiana plant that builds truck engines.

whereabouts and the reason for his continued absence.[3]

On January 29, 1996, Cameron again appeared at the plant dispensary. Cameron was met that day by Dr. Luis Villarruel ("Dr.Villarruel"), the plant physician, and Jerry Rogers ("Rogers"), then the labor relations manager for the Indianapolis plant. Dr. Villarruel and Rogers met with Cameron in order to ascertain why Cameron had been absent and to inform him that he was in violation of the company's policy against being absent for more than five days without notification or justification.[4]

At the meeting with Dr. Villarruel and Rogers, Cameron presented notes from two doctors: (1) Dr. Blair MacPhail ("Dr.MacPhail"), the doctor who had seen Cameron at Indiana Community Hospital, and (2) Dr. Charles Chen ("Dr.Chen"), whom Cameron later identified as the doctor he had been seeing since November 1995. The note from Dr. MacPhail was undated and stated that Cameron "may be released to return to work Tues. Jan. 16th." The note from Dr. Chen, dated January 25, 1996, stated that he had treated Cameron from January 16th through January 25th and that Cameron "was totally disabled to work at [sic] present time."

Dr. Villarruel and Rogers determined that the notes presented by Cameron—which they considered to be in direct conflict with each other—did not provide sufficient justification for his continued absence. In a further attempt to discern Cameron's medical condition and return to work status, Dr. Villarruel and Rogers asked Cameron to sign a medical release form so that this information could be obtained directly from both Dr. Chen and Dr. MacPhail. Cameron initially refused to sign the release; however, after meeting with the acting vice president of the union, Cameron provided the release to Rogers and Dr. Villarruel.

After receiving the medical release from Cameron, Dr. Villarruel sent letters to both Dr. Chen and Dr. MacPhail, requesting that they provide him with more detailed information concerning Cameron's alleged medical condition, treatment and return-to-work status. By February 13, 1996, Navistar had not received a response from either doctor. Rogers, therefore, notified the union that Cameron was in immediate jeopardy of being terminated pursuant to ¶ 652 of the Main Labor Contract. (*See* footnote 4.)

After receiving no response from the union and/or Cameron's doctors, Cameron was terminated two days later, on February 15, 1996, for his continued failure to provide Navistar with reasonable cause for his absence between January 11, 1996 and January 29, 1996. Rogers attempted to notify Cameron about his termination via certified mail, but the letter was returned unopened.

On March 18, 1996, Cameron appeared at Rogers' office with a note from Dr. Chen. Rogers explained to Cameron that he had been terminated pursuant to ¶ 652 of the union contract, and he gave Cameron the termination letter.

On July 17, 1997, Cameron filed his Complaint alleging that: (1) Navistar discriminated against him in violation of the ADA; (2) under Indiana law, Navistar terminated him in retaliation for filing a worker's compensation claim; and (3) his termination from Navistar amounted to intentional infliction of emotional distress. Navistar now moves for summary judgment.

---

**3.** Cameron says that he did not return the phone calls from Navistar because he "was under treatment" after his January 1996 injury.

**4.** Navistar's Indianapolis plant is unionized and the relevant labor contract provides at ¶ 652 of the Main Labor Contract that "employees who are absent from work in excess of five working days without reporting to the Human Resources Department or without establishing a reasonable cause for such absence are subject to immediate discharge."

## DISCUSSION

### I. Standards for Summary Judgment

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party has the initial burden of submitting affidavits and other evidentiary material to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To overcome a defendant's motion, the plaintiff cannot rest on the pleadings but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue of fact. *See* Fed.R.Civ.P. 56(e). While the record "and all reasonable inferences drawn from it [are to be viewed] in the light most favorable to the party opposing the motion," *Bisciglia v. Kenosha Unified Sch. Dist. No. 1,* 45 F.3d 223, 226 (7th Cir.1995), the nonmovant must show more than "some metaphysical doubt" regarding the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### II. Americans with Disabilities Act Claim

Cameron claims that Navistar discriminated against him in violation of the ADA. The ADA prohibits employers from discriminating against qualified individuals with a disability because of the disability of such individual with respect to job application, hiring, advancement, discharge, and other terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a) (1998).

There are two types of ADA disability discrimination claims: (1) disparate treatment claims, alleging that a qualified individual with a disability was treated differently than nondisabled employees due to his disability, *see Sieberns v. Wal–Mart Stores, Inc.,* 125 F.3d 1019, 1021–22 (7th Cir.1997); and (2) failure to provide a reasonable accommodation claims, alleging that the employer did not make reasonable accommodation for the known physical or mental limitations of an otherwise qualified individual, *id.* at 1022. Here, Cameron solely raises a failure to reasonably accommodate claim.

The ADA only prohibits employers from discriminating against "qualified individual[s] with a disability because of the disability." 42 U.S.C. § 12112(a). *See also Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 563 (7th Cir.1996) Thus, before Cameron would be entitled to a reasonable accommodation, he must first demonstrate that he has a "disability" as defined by the ADA. In the event that Cameron demonstrates such a "disability," he must additionally demonstrate that he is a "qualified individual with a disability" as defined by the ADA. The determination regarding whether an individual is such a "qualified individual with a disability" must be made as of the time of the employment decision. *Id.*

### A. Cameron Is Not "Disabled" Under The ADA

For the purposes of the ADA, the term "disability" means one of the following: (1) "a physical or mental impairment that substantially limits one or more of the major life activities," (2) "a record of such impairment," or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2). *See also Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 (7th Cir. 1995). The regulations promulgated pursuant to the ADA include mental illness as an example of an "impairment" for ADA purposes. *See* 29 C.F.R. § 1630.2(h)(2).

The applicable regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,

breathing, learning and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means that the person is either "[u]nable to perform a major life activity" or is "significantly restricted as to the condition, manner or duration" under which the individual can perform the major life activity as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1). In determining whether a disability "substantially limits" a person from performing a major life activity, courts look at the following factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent impact or expected permanent impact of the impairment. *See* 29 C.F.R. § 1630.2(j)(2).

 Here, Cameron asserts that he has a mental impairment. Cameron provides evidence[5]—particularly medical records[6]—which he contends demonstrates that his alleged impairment "progressed from his fear of suspended air tools and fear when engaging in simple life activities such as shopping" to "the inability to do daily activities, paranoid ideation, and cognitive abnormalities, fear of leaving the home and fear of driving." (Pl.Resp. at 4.) Cameron also asserts that his impairment substantially limited his ability to work. (*Id.* at 6.)

Upon close review of the evidence here, the Court finds that a reasonable jury could not determine that Cameron suffered from a mental impairment that "sub-

stantially limit[ed] one or more of the major life activities" at the time of Navistar's employment decision. Initially, most of the medical records relied upon by Cameron were drafted and pertain to his condition well after Navistar's February 15, 1996 employment decision. (*See, e.g.,* Pl .Ex. 15 (11/13/96 report), Ex. 16 (2/13/97–2/18/97 report), Ex. 17 (4/17/97 & 1/28/98 report)). These records, other than one suggestion that Cameron became "frightened to go out alone" or "go to a store" after his accident (*see* Pl.Ex. 15 at 2), do not shed light on Cameron's condition at the relevant time.

 Moreover, the medical records which do shed light on Cameron's condition as of February 15, 1996 do not support his contention that his alleged impairment substantially limited a major life activity. For example, a December 7, 1995 doctor's report did not note any of Cameron's alleged substantial limitations, but concluded: "I feel that [Cameron] is now capable of returning to work without limitations." (Pl.Ex.12.) In addition, although a December 15, 1995 doctor's report noted Cameron's "uneasiness when shopping at a retail store," the doctor recommended that Cameron "return to work immediately" with restrictions. (Pl. Ex.13.)[7]

 Finally, Cameron directs the Court to two pages of his December 3, 1997 deposition testimony. Although Cameron testified therein that he had some difficul-

---

**5.** Actually, Cameron merely provided a list of some medical records and stated that "close examination of the records" would substantiate Cameron's disability claim. Notwithstanding the fact that Cameron failed to provide this information in a proper 12(N) submission and did not even specifically identify the portions of the records which allegedly support his claim, this Court has undertaken Cameron's requested "close examination" of the records.

**6.** Parenthetically, none of the medical records Cameron relies upon are admissible—except for Navistar's medical records—because Cameron has failed to verify them through a sup-

porting affidavit from a records custodian, health care provider, or anyone else with personal knowledge of the alleged facts contained therein. *See, e.g., Gazaway v. Makita U.S.A., Inc.,* 11 F.Supp.2d 1281, 1287 n. 8 (D.Kan.1998); *Gordon v. Sheahan,* No. 96 C 1784, 1998 WL 341796, at *2 (N.D.Ill. June 10, 1998).

**7.** Cameron's other medical records pertaining to the relevant time period similarly do not support his contention. One record is merely a referral slip (Pl.Ex.6) and another one, allegedly "records of Dr. Chen," is illegible (Pl.Ex.14).

ty shopping and driving, the testimony does not identify what time period it relates to. Thus, this testimony again does not assist in discerning Cameron's condition as of February 15, 1996. Indeed, although Cameron has submitted an affidavit with his response brief, it does not contain anything that would suggest to this Court that his condition as of February 15, 1996 substantially limited a major life activity. (*See* Pl.Ex. 8.) Thus, other than scattered references to an alleged uneasiness when shopping, there is no indication that Cameron's alleged mental condition substantially impaired a major life activity at the time Navistar terminated him.

■ It is especially clear to this Court that a reasonable factfinder could not conclude that Cameron was substantially limited in the life activity of working. In this context, "substantially limits" means "significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996) (citing 29 C.F.R. § 1630.2(j)(3)(i)). "[A]n inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Id.* at 524.

■ Although courts do not require that plaintiffs establish the precise percentage of jobs their impairment precludes them from performing, Cameron has not set forth any evidence regarding what jobs he could or could not perform. Without some evidence suggesting that Cameron could not perform a class of jobs or a broad range of jobs in various classes, his alleged impairment does not meet the definition of a disability.

In sum, upon this Court's careful review of Cameron's evidence of disability, the Court finds that a reasonable jury could not conclude that Cameron was substantially limited in a major life activity at the time of his termination by Navistar.

**B.** *Cameron Does Not Have "Qualified Individual" Status Under The ADA*

■ Furthermore, even assuming that Cameron is "disabled" under the ADA, a reasonable jury could not find that Cameron was a "qualified individual" under the ADA at the time Navistar terminated him. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(a). The plaintiff bears the burden of proof on this issue. *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995).

■ Here, Cameron does not dispute that the use of air and electric tools was an essential function of his job as an assembler. (Pl.12(n) Resp. ¶ 6.) Cameron further does not dispute that, at the time he was terminated, he could not perform the essential duties of any assembler position, as all of them involved the use of, or had within the work area, suspended tools. (*Id.* at ¶ 9.) Moreover, Cameron does not identify any accommodation that Navistar could have made whereby Cameron could have performed an assembly position. That being the case, Navistar was not required to otherwise alter the essential functions of Cameron's position; "reasonable accommodation does not encompass reallocation of essential job functions." *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir.1996). *See also Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 697–98 (7th Cir.1998).

Although Cameron does not assert that there are any accommodations under which he could perform his assembler position, Cameron alleges that Navistar could have accommodated him by: (1) reassigning him to a position which did not involve suspended tools, (2) allowing him to remain on light duty, or (3) granting him "special leave." (Pl.Resp. at 8–10.) The ADA, however, did not obligate Navistar

to arrange these accommodations in Cameron's situation.

First, Navistar had no obligation to reassign Cameron to another position. An employer is obligated to consider reassignment under the ADA only if there is a vacant position available for which the employee is qualified, *see Malabarba,* 149 F.3d at 699, and there is unrebutted evidence that there was no such position available for Cameron at Navistar (*see* Def. 12(m) ¶ 9; Def.Ex. C ¶ 13).[8] Second, "[a]lthough the ADA provides that reassignment to a vacant position may constitute a reasonable accommodation, it does not require that employers convert temporary 'light-duty' jobs into permanent ones," *Malabarba,* 149 F.3d at 697, and the unrebutted evidence reveals that there are no permanent "light duty" positions at Navistar (*see* Def. 12(m) ¶ 10, Def.Ex. C ¶ 11). Finally, there is no evidence whatsoever that Cameron requested that Navistar place him on "special leave," and "[if] the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Pellack v. Thorek Hosp. & Medical Cent.,* 9 F.Supp.2d 984, 990 (N.D.Ill.1998). *See also* 29 C.F.R. § 1630.9 App (1995).

In sum, because a reasonable jury could not determine that Cameron has met his burden of demonstrating that he is a "qualified individual with a disability" as defined by the ADA, summary judgment must be granted for Navistar.

III. *Indiana State Law Claims*

Having granted summary judgment regarding Cameron's ADA claim, there is no federal claim pending before this Court. The Court, in its discretion, declines to accept supplemental jurisdiction over Cameron's state law claims. *See* 28 U.S.C. § 1367(c). *See also City of Chicago v.*

*International College of Surgeons,* 522 U.S. 156, 118 S.Ct. 523, 533–34, 139 L.Ed.2d 525 (1997) (stating that pendent jurisdiction is a matter of discretion); *Vukadinovich v. Board of Sch. Trustees,* 978 F.2d 403, 415 (7th Cir.1992) ("It is well established that if federal claims are dismissed before trial, the federal district courts should generally dismiss the state law claims as well."); *Vakharia v. Swedish Covenant Hosp.,* 987 F.Supp. 633, 643 (N.D.Ill.1997) ("Ordinarily, if a court rules against a plaintiff on all federal claims short of trial, the pendent state law claims are dismissed without prejudice.").

### CONCLUSION

For the reasons stated herein, Navistar's motion for summary judgment is granted. Cameron's ADA claim is dismissed with prejudice. Cameron's state law retaliation and intentional infliction of emotional distress claims are dismissed without prejudice.

---

8. Cameron asserts that Navistar should disregard the seniority provisions in its collective bargaining agreement in finding an alternative position for Cameron. However, "[a]n employer is not required to violate the provisions of a collective bargaining agreement to reassign a disabled employee pursuant to the ADA." *Cochrum v. Old Ben Coal. Co.,* 102 F.3d 908, 912–13 (7th Cir.1996).